UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:20-CV-150 (WOB)

LEZLIE J. GUNN                                                    PLAINTIFF

VS.                    MEMORANDUM OPINION AND ORDER

HANS-PETER WILD                                                   DEFENDANT

Plaintiff Lezlie Gunn (Gunn) brought this action for breach of contract against Defendant Hans-Peter Wild (Wild). Wild moved to dismiss Gunn's Amended Complaint (Doc. 32) for lack of personal jurisdiction under Fed. R. Civ. Proc. (FRCP) 12(b)(2) and forum non conveniens. (Doc. 33). Having reviewed the parties' pleadings, the Court now issues the following Memorandum Opinion and Order.

I. BACKGROUND[1]

Wild previously moved to dismiss Gunn's original complaint (Doc. 1, Gunn Compl.) for lack of personal jurisdiction and forum non conveniens. (Doc. 12, Wild Mot. to Dismiss). The Court denied Wild's first motion without prejudice on June 15, 2021, but it ordered Gunn to file an amended complaint "alleging with

---

[1] The Court proceeded without an evidentiary hearing on this motion, so Gunn's pleadings and affidavits frame the factual basis of this personal jurisdiction analysis, see *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). The following recitation of facts derives from the averments in Gunn's amended complaint.

1

specificity the acts that give rise to personal jurisdiction in this matter." (Doc. 27, Min. Order Den. Mot.). Gunn filed an amended complaint and Wild moved again for dismissal. (Doc. 32 Gunn Am. Compl.; Doc. 33, Wild Mot. to Dismiss Am. Compl. ("Wild MTD")). That motion is now before the Court.

Gunn is a resident of Nevada. (Doc. 33, Gunn Am. Compl. at ¶ 2). Wild is now a citizen and resident of Switzerland, but was a citizen and resident of Germany prior. (Doc. 1, Gunn Original Compl. at ¶ 1; *Id.* at ¶ 1. *See also* Doc. 33-1, at ¶¶ 3-5). In 1994, Wild established a significant business presence in Erlanger, Northern Kentucky by purchasing 100% of the stock in an existing company and renaming it Wild Flavors, Inc. (Doc. 32, Gunn Am. Compl. at ¶¶ 10-11). He then built corporate headquarters in Northern Kentucky in 1998 where he and Gunn maintained offices and attended business meetings. (*Id.* at ¶¶ 11-13). Wild also stayed in a condominium in Crestview Hills, allegedly staying there over 100 times, sometimes with Gunn, and which the parties refer to as the "Palmer Court residence." (*Id.* at ¶¶ 6, 14).

Gunn alleges she benefited Wild and his business in several significant ways. (*Id.* at ¶¶ 7-10, 15). Gunn claims her counsel and advice was instrumental to the growth and success of Wild's multi-billion-dollar business and that she traveled all over the world with Wild as he "relied on Ms. Gunn to assist him with almost

everything he did and insisted on her feedback on decisions he was considering." (*Id.* at ¶ 9). These benefits and services purportedly formed the impetus for a Release and Settlement Agreement ("RSA") between the parties, the contract central to this case. (*Id.* at ¶ 40).

According to Gunn's amended complaint, she is responsible for a series of services and favors to Wild, beginning in 1994 when she claims to have brokered and advised the acquisition and establishment of assets supporting Wild Flavors's permanent plant operations in Northern Kentucky. (Doc. 32, Gunn Am. Compl. at ¶¶ 10-12). Gunn thereafter played a critical role in a highly profitable supply agreement for Wild Flavors worth "$160 million to $200 million." (*Id.* at ¶ 16). Gunn also more generally assisted Wild and his company in product development, provided "due diligence" in documents under Wild's consideration, gave general business advice, and recommended policies and safety measures for Wild Flavors employees. (*Id.* at ¶ 15).

Later in 2013, Gunn rescheduled an ophthalmologist appointment of Wild's, delaying a planned trip to Germany, which, by happenstance, averted his arrest by German tax authorities. (*Id.* at ¶ 20). After narrowly avoiding arrest, Wild stayed at the Palmer Court condo where, with Gunn present, he met immediately with Wild Flavors President and CEO, Michael Ponder, to discuss

3

the liquidation of Wild Flavors. (*Id.* at ¶¶ 21-22). Thereafter, Gunn attended various meetings with potential buyers around the country and prepared Wild "at all relevant times." (*Id.* at ¶¶ 23, 25-26). Much of these sale negotiations were conducted in Northern Kentucky as a "base of operations." (*Id.* at ¶ 26). Finally, Gunn claims to have strongly advised Wild against granting an absolute power of attorney pursuant to the eventual sale agreement, and to personally attend the sale in Zurich, Switzerland. (*Id.* at ¶¶ 27-28). Gunn claims this advice "thwarted" the use of the POA in a "conspiracy" to divert billions in funds from the sale to German tax authorities. (*Id*. at 28).

For all of this, Gunn claims Wild repeatedly and emphatically praised and thanked her, orally promising her a "lifetime of unlimited spending for whatever you want to purchase, need or desire, any gifts you want to give, anyone you want to hire or contract with." (Doc. 32, at ¶¶ 29, 31). Wild allegedly orally reiterated his promises several times to Gunn at the Palmer Court residence in Kentucky, (*see id.* at ¶¶ 32-33), then publicly referred to these promises at the Metropolitan Club in Covington, Kentucky during a celebratory dinner with the board of directors of the company that purchased Wild Flavors. (*Id.* at ¶ 35).

Gunn has since argued that these statements established an enforceable set of obligations from Wild to Gunn. In 2015, a year

4

after Wild sold Wild Flavors, she claims these promises were finally reduced to a written RSA executed by the parties in Zug, Switzerland. (*Id.* at ¶ 40). Wild allegedly breached this agreement by, among other things, failing to pay Gunn's agreed-upon bills and expenses, failing to pay for her medical insurance, failing to fund an education trust account for certain children, failing to pay Gunn's yearly "gift amount," and failing to provide various items to emergency service departments. (Doc. 1, Gunn Original Complaint at ¶¶ 2-21; Doc. 32, Gunn Am. Compl. at ¶ 1).

Two federal district courts, one in California and one in Nevada, have already held Gunn failed to prove personal jurisdiction over Wild. *Gunn v. Hans-Peter Wild & Does 1-10*, No. SACV 20-00820JVS, 2020 WL 5167755 (C.D. Cal. June 11, 2020); *Gunn v. Wild*, No:17-cv-72 JCM-GWF, 2018 U.S. Dist. LEXIS 8042, 2018 WL 473005 (D. Nev. Jan. 18, 2018). The Ninth Circuit affirmed the Nevada decision. *See Gunn v. Wild*, 771 F. App'x 392 (9th Cir. 2019). This is the third suit Gunn brought in the United States pertaining to the RSA. However, Gunn has apparently found some success in litigation in Switzerland, having obtained a judgment in her favor premised on Wild's breach of the same RSA. (Doc. 25-1, Translated Swiss Decision at 38).

**II. ANALYSIS**

The main issue before the Court is whether, given Gunn's allegations of Wild's connections to Kentucky, the Court may

5

exercise personal jurisdiction over Wild, a citizen and resident of Switzerland, for breach of a contract executed in Switzerland and not otherwise connected to Kentucky in terms of contract performance. Wild argues in his motion that the connection between the RSA and his Northern Kentucky activities is too attenuated to confer jurisdiction to the Court, even taking Gunn's averments as true. (*See* Doc. 33, Wild MTD at 3). Further, the RSA expressly contains a merger clause rendering the written agreement the only exclusive outstanding agreement between the parties. Wild emphasizes how he has never been a Kentucky resident or United States citizen, and no term of the RSA was contemplated to be performed in Kentucky. Gunn argues to the contrary in defense of her claim that the RSA necessarily arises out of Wild's significant business activities in Kentucky which led Wild to make oral promises in Kentucky, promises that were ultimately memorialized in the written RSA between Gunn and Wild. (*See* Doc. 32, Gunn Am. Compl. at ¶¶ 47). This, she claims, establishes sufficient contact with Kentucky to support personal jurisdiction.

For reasons to follow, the Court finds the allegations in Gunn's amended complaint, even taken as true, are insufficient to furnish personal jurisdiction over Wild regardless, of the merits of Wild's assertion of forum non conveniens.

**A. Standard of Law**

6

In the face of a 12(b)(2) motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing of the Court's personal jurisdiction over the defendant. *Intera Corp. v. Henderson*, 428 F.3d 605 (6th Cir. 2005) (citing *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)). At least in a case like this where the Court has foregone an evidentiary hearing, the pleadings and affidavits form the basis of a plaintiff's assertion personal jurisdiction exists, and those filings are to be viewed in a light most favorable to her. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). Personal jurisdiction may be either "general" or "specific." *Intera Corp.*, at 615 (citing *Bird v. Parsons*, 289 F.3d 865, 873 (6th Cir. 2002)). Each type of jurisdiction is discussed in turn.

**B. General Jurisdiction**

General jurisdiction exists where a defendant's contacts with a state are so continuous and systematic as to render him "at home" in that jurisdiction. *Bird*, 289 F.3d 865, 873 (6th Cir. 2002) (citing *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989)). Thus, personal jurisdiction may be based purely on a defendant's more consistent, general presence in the state, even where the specific acts giving rise to the plaintiff's claim are not so specifically or directly connected to the state. *See Daimler AG v. Bauman*, 571 U.S. 117, 167 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S.

7

915, 919 (2011)). For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile. *Ford Motor Co. v. Montana Eight Judicial District Court*, 141 S. Ct. 1017, 1024 (2021); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). A person's domicile is what they would identify as their "home," where they have made a true, fixed and principal residential establishment to which they intend to return. *See* 13E Charles Alan Wright & Arthur Miller, *Fed. Prac. & Proc. Juris.* § 3612 (3d ed. 2021).

Of course, Wild is being sued in his individual capacity. As an individual, he is a citizen and resident of Switzerland, and before that he was a German citizen and resident. He has never been a United States citizen or a Kentucky resident. The Palmer Court condominium he purchased in Northern Kentucky, although residential in character, was not a personal abode Wild ever intended to stay in primarily and indefinitely as if it were "home." The condo was merely a place he stayed while on business in Kentucky managing the affairs of Wild Flavors. And his Kentucky business activities at the Erlanger plant, though significant to his company, Wild Flavors, were not so great and constant as to render Wild himself *personally* "at home" in Kentucky. Thus, the Court has no general personal jurisdiction over Wild. Gunn must, then, prove specific personal jurisdiction.

**C. Specific Jurisdiction**

8

This case is before the Court in diversity, no general personal jurisdiction exists over Wild personally, so the Kentucky state long-arm statute, Ky. Rev. Stat. (KRS) § 454.210, controls whether the Court may exercise personal jurisdiction over Wild, a citizen and resident of a foreign country. *See Theunissen*, 935 F.2d at 1459. Specifically, Gunn must rely on KRS 454.210(2)(a)(1) to establish specific personal jurisdiction by proving her claim "arises from" Wild's "[t]ransacting business in th[e] Commonwealth," as none of the other enumerated provisions apply to her claim. *See generally* KRS 454.210(2). It is not enough under Kentucky's long-arm statute for a non-resident defendant to have transacted business in the Commonwealth. *See Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 55 (Ky. 2011). Gunn must also show that her claim *arises from* the particular transactions or business activities in Kentucky. *See id.*

Under the conventional test for specific personal jurisdiction, Wild's actions must demonstrate, first, that he purposefully availed himself of the privilege of acting in the forum state, Kentucky, or causing a consequence in the forum state *with specific respect to the RSA* at the center of this action. *See Johnson v. Diamond Shine, Inc.*, 890 F. Supp. 2d 763, 770 (W.D. Ky. 2012) (citing *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). Second, Gunn's claim must "arise from or relate to" Wild's activities in

9

Kentucky. *Ford Motor Co.*, 141 S. Ct. at 1027. Third, exercise of jurisdiction under the circumstances must comport with more general concepts of "reasonableness." *See id.* With respect to the third "reasonableness" element in the context of a contract dispute, negotiations and contemplated future consequences, along with the terms of the contract and parties' actual course of dealing, must be considered to determine whether the defendant purposefully established minimum contacts within the forum via his contract. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). Accordingly, in a contract action like this, the Court must identify whether Wild's locus of intent was to create "continuous and substantial consequences" in the forum state by executing the contract. *See id.*

Gunn's theory of personal jurisdiction can be distilled, in a light most favorable to her, to the following: Wild engaged in major, critical business activities in Northern Kentucky with which Gunn was intimately and necessarily involved. Her consulting role was instrumental to the establishment of the "crown jewel" Kentucky plant, Wild Flavors's subsequent growth, and the company's eventual sale. As a show of appreciation, and while he was in Kentucky, Wild orally promised to Gunn a life of "unlimited spending," among other things. The written RSA is fundamentally a continuation or settlement of those promises; its very existence

10

is a reference to those promises, so the RSA has an inherent and significant connection to Wild's business in Kentucky. Thus, Wild's breach of the RSA "arises from" Wild's business transactions in Kentucky.

As to the first element, "purposeful availment," the fact remains that Gunn's breach of contract claim arises distinctly from Wild's alleged breach of the written RSA, not from Wild's Kentucky business activities, at least not directly. Kentucky is not mentioned or referred to once in the RSA. There is no indication any of the RSA's terms were necessarily to be fulfilled in Kentucky or for someone residing or working in Kentucky. Moreover, the inclusion of a *Nevada* choice-of-law provision, the fact neither party is a Kentucky resident, and the contract's location of execution in Switzerland all further contribute to the overall sense that Kentucky was never the contract's locus of origin, much less anticipated as a place where disputes might arise from the RSA, even less foreseeably where they would be resolved. Reading the RSA itself, Gunn clearly executed the agreement for *present* and *future* consideration, namely future consulting services, not past services that may have been rendered in Kentucky. (*E.g.*, Doc. 33-2, RSA at ¶¶ 11-18). There is simply nothing else about the RSA itself on its face that establishes a connection between Wild and the RSA to Kentucky. Gunn's assertion that her breach of contract claim "arises from" past business

11

activities is simply too tenuous, even if she is believed to have played such a critical role in Wild's business. Thus, Wild cannot be said to have "purposefully availed himself" of Kentucky law by executing the RSA or fulfilling his contractual obligations thereunder.

Beyond the written RSA, jurisdiction over Gunn's claim relies in large part on the oral promises Wild allegedly uttered to Gunn in Kentucky before he later executed the RSA. Under Gunn's theory, the parties' agreement truly originated in Kentucky even if it was only written and signed later in Switzerland, implying the oral promises amount to purposeful availment. But the RSA is now the contract Gunn asks this Court to enforce. This contract contains clear language foreclosing any legitimate acknowledgement of prior negotiations or agreements. The second paragraph of the RSA, phrased as a release of claims, states: "Gunn[]hereby forever releases Dr. Wild from claim(s), suit(s), action(s), legal proceeding(s), liabilities and/or damages *arising directly from any and all agreements, whether verbal or in writing, entered into by Dr. Wild and Ms. Gunn*,[] but excluding this Agreement ...." (Doc. 33-2, RSA at ¶ 2). This provision clearly applies to any previous oral promises Wild may have made to Gunn in Kentucky.

The Court also finds dispositive the inclusion of a merger clause under paragraph 24, which reads: "With the signing of this document, all agreements, excluding this Agreement[]with Ms. Gunn

12

or parties affiliated with Ms. Gunn will be fully satisfied and there will be no additional outstanding agreements either with either Ms. Gunn or parties affiliated with Ms. Gunn ...." (Doc. 33-2, ¶ 24). When Gunn signed this contract, with this language, she signed away any prior claims based on prior oral promises, whether Wild made these promises as alleged or not. Thus, though a single act, such as a purported oral promise, may be sufficient to constitute purposeful availment, *Youn v. Track, Inc.*, 324 F.3d 409, 418 (6th Cir. 2003), the merger clause effectively eliminated that connection by rendering such promises null and void.

On to the second "arising from" element, "[i]f a defendant's contacts with the forum state are *related* to the operative facts of the controversy, then an action will be deemed to have arisen from those contracts." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996) (emphasis added). This second element "does not require that the cause of action *formally* 'arise from' defendant's contacts with the forum; rather, this criterion requires only 'that the cause of action, *of whatever type*, have *a substantial connection* with the defendant's in-state activities.'" *Johnson*, 890 F.Supp.2d 763, at 769 (W.D. Ky. 2012) (emphasis added) (citing *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989)).

If Gunn's pleadings are taken as true and construed most in her favor, it is not entirely unreasonable for her to argue that

13

her claim has a "substantial connection" to Wild's purposeful business activities in Kentucky. But for the reasons above, especially given the unequivocal contract language, a narrower view of "arising from" under these facts is appropriate, i.e., her breach of contract claim "arises" more directly "from" the RSA, though admittedly a "substantial connection" exists between the RSA and Wild's Kentucky business contacts, taking Gunn's allegations as true.

Still, the third factor remains: the overall reasonableness of exercising jurisdiction given the consequences and purposefulness of Wild's forum contacts. *Theunissen*, 935 F.2d at 1460. Courts in the Sixth Circuit must still resolve the third reasonableness factor by considering "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988).

In this case, while Wild is very wealthy, he is and has been a resident and citizen of a foreign country for, as far as this Court has been made aware, his entire life. Many of the reasons stated in the purposeful-availment analysis could be reiterated here, especially those regarding the apparent expectations of the parties that Kentucky would not have much, if anything, to do with the execution or fulfillment of the RSA. Further, Wild had washed

his hands of any Kentucky connection, at least as far as Gunn's claim is concerned, by selling the Erlanger plant in 2014 before executing the RSA the next year in 2015.  So by 2015, he no longer had any interest in Kentucky, and the Commonwealth of Kentucky had no remaining interest in personal jurisdiction over him.  Moreover, Kentucky is not the only forum where Gunn can obtain relief, as, in fact, it appears she has found at least partial success independently, at least for the time being, through litigation in Switzerland.  Under such circumstances, exercising specific personal jurisdiction over Wild is not reasonable.  Even without the RSA's release and merger clauses, Gunn still fails to satisfy the conventional test for specific personal jurisdiction.[2]

The issue of forum non conveniens is, therefore, moot, as without personal jurisdiction Wild's difficulties or expense litigating this case are immaterial.  The Court resolves this case on jurisdictional grounds.

### III.   CONCLUSION

---

[2] In another case before this Court involving Defendant Wild, *Michael H Ponder v. Hans-Peter Wild*, Case No. 2:19-cv-00166, currently on docket pending further litigation, this Court held personal jurisdiction existed over Wild Flavors president and CEO, Michael Ponder, based on Wild's "transacting business" in Kentucky. (*Ponder*, ECF Doc. 26, Min. Order. Den. Mot. to Dismiss, of that case (citing KRS 454.210(2)(a)(1)); Doc. 29 Am. Tr. of Mot. Hr'g).  The obvious distinction between Ponder's case and this case is how much more strongly and directly connected Ponder's business-related claims are to Kentucky as a forum of litigation. *See id.* Ponder directly brokered the $2 billion sale of assets and business interests, as a going concern, located in Erlanger, Kentucky, and his breach of contract claim for lost bonus or commission *on the sale* was inherently related to that deal.  He was not merely present at the negotiations and deals.  Ponder, a Kentucky resident, acted as Wild's agent in brokering the sale of assets and business interests in Kentucky, from a Wild Flavors office in Kentucky, and was told by Wild prospectively that he would be compensated for based on the success of the sale. (*Id.* at 13:3-21).

15

Having reviewed this matter, and the Court being advised, Gunn has failed to prove the Court's personal jurisdiction over Wild as to her breach of contract claim. Accordingly, it is **ORDERED** that Hans-Peter Wild's Motion to Dismiss for Lack of Jurisdiction (Doc. 33) be, and is hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.

This 9th day of December 2021.



Signed By:
**William O. Bertelsman** WOB
United States District Judge